## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ANTONIO CRAWFORD,** | : | **Civil No. 1:14-CV-1682** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **(Judge Caldwell)** |
| | : | |
| **LT. WHITE, et al.,** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **Defendants.** | : | |

## REPORT AND RECOMMENDATION

### I.   Statement of Facts and of The Case

#### A.   Procedural History

This case presents an unusual circumstance.  The plaintiff, Antonio Crawford, a federal inmate, has sued his jailers, alleging that they violated his constitutional rights by using excessive force when they intervened and prevented what appeared to be a suicide attempt by Crawford.  Thus, Crawford decries the degree of force used by staff when they engaged in an effort to prevent what they perceived as Crawford's threatened self-destruction.  For the reasons set forth below, we believe that these prison official cannot be faulted for taking steps to protect Crawford from himself, conclude that Crawford's claims, as pleaded, fail and recommend that this complaint should be dismissed.

This is a *pro se* civil rights case that was brought by Crawford through the filing of a civil rights complaint on August 28, 2014.  (Doc. 1.)  In this complaint, Crawford alleged that prison officials violated his Eighth Amendment right to be free from cruel and unusual punishment by employing excessive force against him during, and after, a January 4, 2013, cell extraction, when prison staff observed that Crawford had placed a noose around his neck.  (Id.)  In its current form, Crawford's complaint names four defendants, the warden at the Lewisburg Penitentiary, J.T.Thomas, an assistant warden at the prison, defendant Frederick, and two correctional lieutenants, Lieutenant White and Lieutenant Sherman.  Also identified, but not named as defendants, are the members of the institution use of force team who participated in Crawford's January 4, 2013, cell extraction.

With respect to these defendants, Crawford's complaint is not a model of clarity, but seems to allege that Lieutenant Sherman was in charge of the cell extraction team that entered Crawford's cell on January 4, 2013, and allegedly used excessive force when they removed Crawford from a noose he had fashioned and tied around his neck.  Lieutenant White, in turn, is also identified as a supervisor on the scene during this alleged assault, although his role in this matter is not clearly described by Crawford beyond an assertion that White failed to act on his behalf or investigate his complaints.  Similarly, Warden Thomas is not alleged to have played

a direct role in these events, but is alleged by Crawford of have "fail[ed] to correct that misconduct." (Doc. 1, p.10.) Assistant Warden Frederick is listed as a defendant in this case but there are no well-pleaded allegations relating to him set forth by Crawford in the body of this complaint. (Id.)

After identifying these defendants, Crawford's complaint makes two specific, and was very general, claim.  Specifically, Crawford alleges that prison staff used excessive force when they removed the noose he had placed around his neck and removed him from his cell on January 4, 2013.  (Id.)  Crawford also asserts that prison official placed restraints on his wrists with excessive force, applying the handcuffs too tightly and causing him gratuitous pain.  (Id.)  Beyond these two very specific allegations, Crawford's complaint then seems to recite in very general terms that the conditions of his confinement at the Special Management Unit of the Lewisburg Penitentiary violate his right to be free from cruel and unusual punishment.  (Id.)  Crawford then seeks relief in the form of an order transferring him to return to a general inmate population.  (Doc. 44.)

On these facts, defendants Thomas, Frederick, Sherman and White have filed a motion to dismiss the complaint, or in the alternative for summary judgment.  (Doc. 30.)  This motion is supported by hundreds of pages of prison records.  This motion is now fully briefed by the parties and is, therefore, ripe for resolution.

B.   **Factual Background**

1.   **Antonio Crawford**

With respect to the plaintiff himself, as we have previously observed:

> Antonio Crawford, is a federal prisoner who is currently serving a 336
> month prison term imposed upon him following his 2007 conviction in
> the District of Columbia for burglary, armed robbery threats, and assault
> with intent to commit first degree sexual abuse. . . .   While in federal
> custody, prior to his placement in the Special Management Unit,
> Crawford had been cited on 21 separate occasions with various
> disciplinary infractions. . . . .   A number of these disciplinary infractions
> involved sexually predatory behavior in prison, a matter of obvious
> concern to prison officials given Crawford's sexually assaultive criminal
> history.   For example, on January 13, 2009, at the Federal Correctional
> Complex at Cumberland, Maryland ("FCC Cumberland"), Crawford
> wrote a poem to a female staff contractor in which he asked her if he
> could have sex with her. . . .   While at FCC Cumberland, Crawford told
> staff members in the Special Housing Unit that he wanted them to open
> his cell door so they could orally copulate him. . . .   Crawford's transfer
> from FCI Cumberland did not curb this sexually predatory behavior.
> Thus, on July 7, 2009, Crawford was cited for yet another incident at the
> United States Penitentiary Allenwood, in which Crawford sexually
> solicited a female teacher, asking if she would go into the bathroom with
> him.

Crawford v. Lappin, No. 1:10-CV-2250, 2011 WL 1983508, at *2 (M.D. Pa. Apr. 20,
2011) report and recommendation adopted, No. 1:CV-10-2250, 2011 WL 1979871
(M.D. Pa. May 20, 2011) aff'd, 446 F. App'x 413 (3d Cir. 2011).

While at Lewisburg Crawford has continued to amass an extensive prison

disciplinary record marked by persistent violence and sexual misconduct, including

more than 40 citations for offenses involving assault, threatening bodily harm,

insolence toward staff, refusing to obey an order, engaging in sexual acts, and indecent exposure.  (Doc. 34-2.)

### 2. Crawford's January 4, 2013, Suicide Attempt and Cell Extraction

Crawford's specific factual allegations relate to a January 4, 2013, episode in which prison staff intervened and prevented what appeared to be a suicide attempt by Crawford, who had tied a noose around his neck.  It is this rescue attempt which forms the basis of Crawford's Eighth Amendment claims.  With respect to this incident the material facts are as follows.

On January 4, 2013, at approximately 6:50 a.m., Crawford began to exhibit assaultive and violent behavior in his cell.  (Doc. 34, ¶6.)  Specifically, Crawford refused staff orders to surrender his morning food trays, saying "get Officer Kemmerer to come get it" and "You don't know who you're fuckin' with.  You fuck with me and I'll fuckin' get ya."  (Id., ¶7.)  While staff spoke with him, Crawford grabbed his food tray and attempted to throw it out the wicket[1] at staff.  (Id., ¶8.).  After staff closed the food slot so Crawford could not throw his tray at Officer Kemmerer, Crawford threatened to kill staff.  (Id., ¶9.)

---

[1]A wicket is a food slot or aperture in a cell door through which items can be passed to inmates by staff.

Because of these threats and because he displayed imminent violence, staff notified the Warden, who authorized a use of force team to assemble. (Id., ¶10.) By 8:01 a.m., on January 4, 2013, this team had assembled and had begun taking steps to avoid a confrontation. (Id., ¶ 11.) As part of these efforts, staff removed Crawford's cellmate, who had not been involved in this disturbance, from the cell. As they were removing Crawford's cellmate, staff saw that Crawford had placed a homemade noose around his neck, which he had tied to the bed post. (Id., ¶12.)

Lieutenant Sherman ordered Crawford to remove the noose from his neck and submit to restraints, but Crawford refused. (Id., ¶13.) A brief confrontation then ensued, as staff entered Crawford's cell, removed the ligature from his neck, placed him on the floor, and applied hand restraints. (Id., ¶14.) One correctional officer suffered minor abrasions as staff gained control over Crawford. (Id., ¶¶15 and 16.) Crawford , in turn, suffered an abrasion to his head, an injury that was determined to have been self-inflicted. (Id., ¶¶18 and 24. ) After staff gained control over Crawford, and applied hand restraints to Crawford, they escorted him to the shower landing where they visually searched him, gave him fresh clothing and placed him in ambulatory restraints. Crawford was then photographed, medically assessed, and treated for an abrasion to his head, his only observed injury. (Id., ¶¶17-18.)

Crawford remained in hand restraints for less than 12 hours. During this time, his circulation and his restraints were checked periodically. With respect to these restraints, Crawford's records specifically noted that the leg and wrist restraints were applied appropriately and in proper position. (Id., ¶19.) Crawford never complained about tightness with the restraints. (Id., ¶23.) Further, while Crawford alleges loss of eye sight and numbness in his arm from a staff assault on January 4, 2013, there is no evidence supporting this averment, nor any documentation that Crawford reported his condition to medical staff. (Id., ¶20.) Instead, medical records show that Crawford had been previously diagnosed with nerve pain in his back and glaucoma; however, Crawford had a history of these conditions prior to the alleged assault. (Id., ¶21.)

### 3.      **Exhaustion of Administrative Remedies**

With respect to exhaustion of administrative grievances, over the years Crawford has filed a total of 251 grievances with prison officials. (Id., ¶1.) These grievances have related to a host of disparate and discrete matters that allegedly occurred at many different times. A review of these grievances has determined that Crawford fully exhausted his grievances with respect to his January 4, 2013, cell extraction, but that his general demand for a prison transfer, which forms the basis of

the only other remaining allegations in his complaint, has never been fully grieved by the plaintiff.  (Id.)

It is against this factual and procedural backdrop, where prison officials intervened to protect Crawford from his own apparent threatened self destruction, that we consider the defendants' motion to dismiss, or in the alternative, for summary judgment.

## II.   **Discussion**

### A.   **Rule 56–The Legal Standard**

The defendants have filed a motion to dismiss, or in the alternative for summary judgment.  In this case, however, all parties have treated this motion as a summary judgment motion.  Therefore, we will assess this motion under the standards which govern summary judgment motions.

Rule 56(a) of the Federal Rules of Civil Procedure, provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. Rule 56(a).  Through summary adjudication a court is empowered to dispose of those claims that do not present a "genuine dispute as to any material fact," Fed. R. Civ. P. 56(a), and for which a trial would be "an empty and unnecessary formality."  Univac Dental Co. v. Dentsply Int'l, Inc., No. 07-0493, 2010 U.S. Dist.

LEXIS 31615, at *4 (M.D. Pa. Mar. 31, 2010).  The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute about a material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party.  Id. at 248-49.

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact.  Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004).  Once the moving party has shown that there is an absence of evidence to support the nonmoving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate.  Celotex, 477 U.S. at 322.  Summary judgment is also appropriate if the non-moving party provides merely colorable, conclusory, or speculative evidence. Anderson, 477 U.S. at 249.  There must be more than a scintilla of evidence

supporting the nonmoving party and more than some metaphysical doubt as to the material facts. Id. at 252; see also, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In making this determination, the court must "consider all evidence in the light most favorable to the party opposing the motion." A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).

Moreover, a party who seeks to resist a summary judgment motion by citing to disputed material issues of fact must show by competent evidence that such factual disputes exist. Moreover, a party who seeks to resist a summary judgment motion by citing to disputed material issues of fact must show by competent evidence that such factual disputes exist. Further, "only evidence which is admissible at trial may be considered in ruling on a motion for summary judgment." Countryside Oil Co., Inc. v. Travelers Ins. Co., 928 F.Supp. 474, 482 (D.N.J.1995). Similarly, it is well-settled that: "[o]ne cannot create an issue of fact merely by . . . denying averments . . . without producing any supporting evidence of the denials." Thimons v. PNC Bank, NA, 254 F.App'x 896, 899 (3d Cir. 2007)(citation omitted). Thus, "[w]hen a motion for summary judgment is made and supported . . ., an adverse party may not rest upon mere allegations or denial." Fireman's Ins. Co. Of Newark NJ v. DuFresne, 676 F.2d 965, 968 (3d Cir. 1982), see Sunshine Books, Ltd. v. Temple University, 697 F.2d 90, 96 (3d Cir. 1982)." [A] mere denial is insufficient to raise a disputed issue of fact,

and an unsubstantiated doubt as to the veracity of the opposing affidavit is also not sufficient." Lockhart v. Hoenstine, 411 F.2d 455, 458 (3d Cir. 1969). Furthermore, "a party resisting a [Rule 56] motion cannot expect to rely merely upon bare assertions, conclusory allegations or suspicions." Gans v. Mundy, 762 F.2d 338, 341 (3d Cir. 1985)(citing Ness v. Marshall, 660 F.2d 517, 519 (3d Cir. 1981)).

Finally, a party who seeks to resist a summary judgment motion must also comply with Local Rule 56.1, which specifically directs a party opposing a motion for summary judgment to submit a "statement of the material facts, responding to the numbered paragraphs set forth in the statement required [to be filed by the movant], as to which it is contended that there exists a genuine issue to be tried"; if the nonmovant fails to do so, "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted." L.R. 56.1. Under the Local Rules, the failure to follow these instructions and appropriately challenge the material facts tendered by the defendant means that those facts must be deemed, since:

> A failure to file a counter-statement equates to an admission of all the facts set forth in the movant's statement. This Local Rule serves several purposes. First, it is designed to aid the Court in its determination of whether any genuine issue of material fact is in dispute. Second, it affixes the burden imposed by Federal Rule of Civil Procedure 56(e), as recognized in Celotex Corp. v. Catrett, on the nonmoving party 'to go beyond the pleadings and by her own affidavits, or by the depositions,

answers to interrogatories, and admissions on file, *designated specific facts showing that there is a genuine issue for trial*.' 477 U.S. 317, 324 (1986) (internal quotations omitted) (emphasis added).

Doe v. Winter, No. 04-CV-2170, 2007 U.S. Dist. LEXIS 25517, *2 n.2 (M.D. Pa. Apr. 5, 2007) (parallel citations omitted; court's emphasis).  A party cannot evade these litigation responsibilities in this regard simply by citing the fact that he is a *pro se* litigant.  These rules apply with equal force to all parties.  See Sanders v. Beard, No. 09-CV-1384, 2010 U.S. Dist. LEXIS, *15 (M.D. Pa. July 20, 2010) (*pro se* parties "are not excused from complying with court orders and the local rules of court"); Thomas v. Norris, No. 02-CV-01854, 2006 U.S. Dist. LEXIS 64347, *11 (M.D. Pa. Sept. 8, 2006) (*pro se* parties must follow the Federal Rules of Civil Procedure).

## B. Crawford's Supervisory Liability Claims Arising Out of This January 4, 2013, Incident Fail Against Defendants Thomas, Frederick and White

At the outset, in its current form, Crawford's complaint fails to state a claim of supervisory civil rights liability against three of the supervisory defendants named in this lawsuit, Warden Thomas, Assistant Warden Frederick, and Lieutenant White, arising out of his January 4, 2013, cell extraction.  In considering claims brought against supervisory officials arising out of alleged constitutional violations, the courts recognize that prison supervisors may be exposed to liability only in certain, narrowly

defined, circumstances.  In this regard, it is clear that a claim of a constitutional deprivation cannot be premised merely on the fact that the named defendants were prison supervisors when the incidents set forth in the complaint occurred.  Quite the contrary, to state a constitutional tort claim the plaintiff must show that the supervisory defendants actively deprived him of a right secured by the Constitution. Morse v. Lower Merion School Dist., 132 F.3d 902 (3d Cir. 1997); see also Maine v.Thiboutot, 448 U.S. 1 (1980).  Constitutional tort liability is personal in nature and can only follow personal involvement in the alleged wrongful conduct shown through specific allegations of personal direction or of actual knowledge and acquiescence in the challenged practice.  Robinson v. City of Pittsburgh, 120 F.3d 1286 (3d Cir. 1997).

In particular, with respect to prison supervisors it is well-established that:

"A[n individual government] defendant in a civil rights action must have personal involvement in the alleged wrongdoing; liability cannot be predicated solely on the operation of *respondeat superior*.  Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir.1988).

Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005).

As the Supreme Court has observed:

Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*. .

-13-

. . See Monell v. New York City Dept. of Social Servs., 436 U.S. 658,
691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (finding no vicarious liability
for a municipal "person" under 42 U.S.C. § 1983); see also Dunlop v.
Munroe, 7 Cranch 242, 269, 3 L.Ed. 329 (1812) (a federal official's
liability "will only result from his own neglect in not properly
superintending the discharge" of his subordinates' duties); Robertson v.
Sichel, 127 U.S. 507, 515-516, 8 S.Ct. 1286, 3 L.Ed. 203 (1888) ("A
public officer or agent is not responsible for the misfeasances or position
wrongs, or for the nonfeasances, or negligences, or omissions of duty,
of the subagents or servants or other persons properly employed by or
under him, in the discharge of his official duties").  Because vicarious
liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead
that each Government-official defendant, through the official's own
individual actions, has violated the Constitution.

Ashcroft v. Iqbal,  556 U.S. 662, 676 (2009).

Applying these benchmarks, courts have frequently held that, in the absence
of  evidence of supervisory knowledge and approval of subordinates' actions, a
plaintiff may not maintain an action against supervisors based upon the misdeeds of
their subordinates.  O'Connell v. Sobina, No. 06-238, 2008 WL 144199, * 21 (W.D.
Pa. Jan. 11, 2008); Neuburger v. Thompson, 305 F. Supp. 2d 521, 535 (W. D. Pa.
2004).  Rather, "[p]ersonal involvement must be alleged *and is only present where
the supervisor directed the actions of supervisees or actually knew of the actions and
acquiesced in them*.  See Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir.1988)."
Jetter v. Beard, 183 F. App'x 178, 181 (3d Cir. 2006)(emphasis added).

Here, in many instances Crawford does little more than name a supervisory official in the caption of the case, and then seek to hold that official personally liable based upon the official's supervisory status without making any specific factual allegations about these defendants in the body of this pleading.  To the extent that Crawford simply premises the liability of these defendants upon their supervisory status without setting forth any further factual basis for a claim in the body of this pleading, this cursory style of pleading is plainly inadequate to state a claim against a prison supervisor and compels dismissal of these defendants.  Hudson v. City of McKeesport, 244 F. App'x 519 (3d Cir. 2007) (affirming dismissal of defendant who was only named in caption of case.)  This principle applies with particular force to defendants Frederick and Thomas, neither of whom are alleged to have participated or been present during this cell extraction.  Indeed, as we have noted, defendant Frederick does not appear to have been mentioned by Crawford anywhere in the body of this complaint.

Nor can Crawford sustain a supervisory liability claim against these officials by simply alleging in a talismanic fashion that they failed to train, oversee or supervise their subordinate employees.  In this regard, we note that: " 'Numerous courts, including this one, have expressed uncertainty as to the viability and scope of supervisory liability after Iqbal.'  Santiago, 629 F.3d at 130 n. 8 (collecting cases);

see also Argueta, 643 F.3d at 70." Bistrian v. Levi, 696 F.3d 352, 366 n. 5 (3d Cir. 2012).  To the extent that supervisory liability survives after Iqbal, the scope of that liability is clearly and narrowly defined.  As the United States Court of Appeals for the Third Circuit has observed: "'[t]here are two theories of supervisory liability' one under which supervisors can be liable if they 'established and maintained a policy, practice or custom which directly caused [the] constitutional harm,' and another under which they can be liable if they 'participated in violating plaintiff's rights, directed others to violate them, or, as the person[s] in charge, had knowledge of and acquiesced in [their] subordinates' violations.'  A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr., 372 F.3d 572, 586 (3d Cir.2004) (second alteration in original)." Santiago v. Warminster Twp., 629 F.3d 121, 129 (3d Cir. 2010).

Crawford cannot rely upon either of these theories of supervisory liability to support his current complaint.  First, Crawford has not alleged well-pleaded facts showing that "the person[s] in charge, had knowledge of and acquiesced in [their] subordinates' violations.'  A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr., 372 F.3d 572, 586 (3d Cir.2004) (second alteration in original)."  Santiago v. Warminster Twp., 629 F.3d 121, 129 (3d Cir. 2010).  Moreover, there is no claim of supervisory liability here grounded upon an assertion that the defendants "established and maintained a policy, practice or custom which directly caused [a] constitutional

harm," Santiago v. Warminster Twp., 629 F.3d 121, 129 (3d Cir. 2010), since

Crawford has not identified any unconstitutional policy which directly led to the

various injuries which he alleges that he has suffered.

Furthermore, to the extent that Crawford's supervisory liability claims rest on

the premise that officials did not after-the-fact investigate or act favorably upon his

past grievances, as seems to be the case with respect to Lieutenant White and Warden

Thomas, this claim also fails. An inmate cannot sustain a constitutional tort claim

against prison supervisors based solely upon assertions that officials failed to

adequately investigate or respond to his past grievances. Inmates do not have a

constitutional right to a prison grievance system. Speight v. Sims, 283 F. App'x 880

(3d Cir. 2008) (citing Massey v. Helman, 259 F.3d 641, 647 (7th Cir. 2001) ("[T]he

existence of a prison grievance procedure confers no liberty interest on a prisoner.").

Consequently, dissatisfaction with a response to an inmate's grievances does not

support a constitutional claim. See also Alexander v. Gennarini, 144 F. App'x 924

(3d Cir. 2005) (involvement in post-incident grievance process not a basis for § 1983

liability); Pryor-El v. Kelly, 892 F. Supp. 261, 275 (D. D.C. 1995) (because prison

grievance procedure does not confer any substantive constitutional rights upon prison

inmates, the prison officials' failure to comply with grievance procedure is not

actionable). See also Cole v. Sobina, No. 04-99J, 2007 WL 4460617, at *5 (W.D. Pa.

Dec. 19, 2007) ("[M]ere concurrence in a prison administrative appeal process does not implicate a constitutional concern."). As the United States Court of Appeals for the Third Circuit observed when disposing of a similar claim by another inmate:

> Several named defendants, such as the Secretaries of the Department of Corrections or Superintendents, were named only for their supervisory roles in the prison system. The District Court properly dismissed these defendants and any additional defendants who were sued based on their failure to take corrective action when grievances or investigations were referred to them. See Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir.1988) (defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior* ); see also Antonelli v. Sheahan, 81 F.3d 1422, 1430 (7th Cir.1996) (state's inmate grievance procedures do not give rise to a liberty interest protected by the Due Process Clause).

Pressley v. Beard, 266 F. App'x 216, 218 (3d Cir. 2008).

Indeed, as to such claims, the United States Court of Appeals for the Third Circuit has recently held that summary dismissal is appropriate "because there is no apparent obligation for prison officials to investigate prison grievances. See Inmates of Attica Corr. Facility v. Rockefeller, 477 F.2d 375, 382 (2d Cir.1973)." Paluch v. Sec'y Pennsylvania Dept. Corr., 442 F. App'x 690, 695 (3d Cir. 2011).

In sum, as presently drafted, the plaintiff's claims against these supervisory defendants consist of little more than assertions of *respondeat superior* liability, coupled with dissatisfaction with the processing of this inmate's past grievances,

assertions which as a matter of law do not suffice to state a constitutional tort claim.

Therefore, these defendants are entitled to be dismissed from this case.

### C.   Crawford's Eighth Amendment Claims Arising Out of This January 4, 2013, Episode Fail as a Matter of Law

Beyond the legal obstacles to imposing supervisory liability on some defendants as a result of this January 4, 2013, cell extraction in which prison staff intervened during what appeared to have been a suicide attempt by Crawford, these Eighth Amendment claims fail for a more fundamental reason.  The undisputed facts simply do not support a finding of any constitutional infraction.

In conducting this legal analysis we are mindful of the constitutional standards which govern Eighth Amendment claims, since Crawford advances two distinct Eighth Amendment claims against the defendants in his complain, alleging, with varying degrees of clarity, constitutional claims under the Eighth Amendment, involving the (1) excessive use of force against him; and (2) deliberate indifference to his needs while he was briefly held in hand restraints.

Each of these Eighth Amendment claims is, in turn, judged against settled legal principles, principles which set precise and exacting standards for asserting a constitutional infraction.   Yet, all of these claims are governed by the same

overarching and animating constitutional benchmarks.  As the United States Court

of Appeals for the Third Circuit has observed:

> The Eighth Amendment protects against infliction of "cruel and unusual punishment."  However, "not every governmental action affecting the interests or well-being of a prisoner is subject to Eighth Amendment scrutiny."  Whitley v. Albers, 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986).  "After incarceration, only the unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth Amendment."  Id. (citation and internal quotations omitted).  "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock." Id.

> Resolution of an Eighth Amendment claim therefore "mandate[s] an inquiry into a prison official's state of mind." Wilson v. Seiter, 501 U.S. 294, 299, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991).  Two considerations define that inquiry.  We must first determine if the deprivation was sufficiently serious to fall within the Eighth Amendment's zone of protections.  Id. at 298, 111 S.Ct. 2321.  If not, our inquiry is at an end.  However, if the deprivation is sufficiently serious, we must determine if the officials acted with a sufficiently culpable state of mind.  Id.  In other words, we must determine if they were motivated by a desire to inflict unnecessary and wanton pain.  "What is necessary to establish an 'unnecessary and wanton infliction of pain ...' varies according to the nature of the alleged constitutional violation." Hudson v. McMillian, 503 U.S. 1, 5, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992).

Fuentes v. Wagner, 206 F.3d 335, 344-45 (3d Cir. 2000).

With these tenets in mind we turn to a consideration of the individual Eighth

Amendment claims advanced here by Crawford.  At the outset, Eighth Amendment

excessive force claims entail a showing of some subjective intent to injure.  In an excessive force case, where "prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is that set out in Whitley v. Albers, 475 U.S. 312 (1986)]: whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson v. McMillian, 503 U.S. 1, 6-7 (1992).

Thus, the keystone to analysis of an Eighth Amendment excessive force claim often entails issues of motivation–whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm. Hudson v. McMillian, 503 U.S. 1, 6-7 (1992).  However, the issue of whether excessive force was used is one which, in proper circumstances, can be determined as a matter of law. In such cases, summary judgment is appropriate when "it appears that the evidence, viewed in the light most favorable to the plaintiff, will [not] support a reliable inference of wantonness in the infliction of pain." Brooks v. Kyler, 204 F.3d 102, 106 (3d Cir. 2000) (quoting Whitley, 475 U.S. at 322).  There are several factors that a court examines in determining whether a correctional officer has used excessive force in violation of the Eighth Amendment, including:  "(1) 'the need for the application of force'; (2) 'the relationship between the need and the amount of force

that was used'; (3) 'the extent of injury inflicted'; (4) 'the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them'; and (5) 'any efforts made to temper the severity of a forceful response.'" Id. at 106.

When considering such claims, the reasonableness of a particular use of force is often dependent upon factual context and must be "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham v. Connor, 490 U.S. 386, 396-7 (1989). Moreover, in the context of prison excessive force claims, in determining "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm," Hudson v. McMillian, 503 U.S. 1, 6-7 (1992), "even if we concede [that an inmate] has established at most that prison officials over-reacted to the disturbance that he caused. . . , any such over-reaction would still fall short of supporting a finding that prison officials acted 'maliciously and sadistically to cause harm.'" Fuentes v. Wagner, 206 F.3d 335, 346 (3d Cir. 2000).

Further, in the specific factual context of excessive force claims based upon allegations relating to a prisoner's handcuffing, courts have acknowledged that, in certain instances, government officials are entitled to qualified immunity as a matter of law. Gilles v. Davis, 427 F.3d. 197, 207 (3d Cir. 2005). With respect to these

particular excessive force claims, the test for qualified immunity can be simply stated: "In these cases, summary judgment for an officer who claims qualified immunity is appropriate where, 'after resolving all factual disputes in favor of the plaintiff,[ ] the officer's use of force was objectively reasonable under the circumstances.' " Id.

Beyond his claims that he was subjected to excessive force by staff, Crawford also seems to allege that prison officials left him in painful physical restraints for an excessive period of time. Inmate Eighth Amendment claims involving the "prolonged use of restraints. . . [are] more properly analyzed under the [Eighth Amendment's] deliberate indifference standard. See A.M. ex. rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr., 372 F.3d 572, 587 (3d. Cir.2004) (deliberate indifference standard appropriate where it did not appear that officials 'were required to make split-second decisions to maintain or restore order through the use of excessive physical force'); Howard v. Bureau of Prisons, Civ. A. No. 3:05–CV–1372, 2008 WL 318387, at *13 (M.D.Pa. Feb.4, 2008) ('Outside the context of a prison disturbance, which is characterized as "a single instance of prisoner unrest where there is a need to act quickly," Eighth Amendment claims are judged by the deliberate indifference standard.'); Trammell v. Keane, 338 F.3d 155, 162–63 (2d Cir.2003) (applying deliberate indifference standard in determining whether deprivation orders, depriving prisoner of certain amenities, were reasonably calculated to restore prison discipline

and security)." <u>Womack v. Smith</u>, 1:06-CV-2348, 2011 WL 819558 (M.D. Pa. Mar. 2, 2011. Under this Eighth Amendment analytical paradigm, courts recognize that prison officials may not be deliberately indifference to harms or injuries suffered by inmates. In <u>Beers-Capitol v. Whetzel</u>, 256 F.3d 120 (3d Cir. 2001), the Court of Appeals explained the basic requirements of deliberate indifference claim brought against a prison official under the Eighth Amendment as follows:

> An Eighth Amendment claim against a prison official must meet two requirements: (1) "the deprivation alleged must be, objectively, sufficiently serious;" and (2) the "prison official must have a sufficiently culpable state of mind."

<u>Id.</u> at 125 (quoting <u>Farmer v. Brennan</u>, 511 U.S. 825, 834 (1994)). Furthermore, in cases involving prison safety or prison conditions, the relevant state of mind "is one of 'deliberate indifference' to inmate health or safety." <u>Id.</u> This deliberate indifference standard "is a subjective standard under <u>Farmer</u> – the prison official-defendant must actually have known or been aware of the excessive risk to inmate safety." <u>Id.</u> Thus, " '[d]eliberate indifference can be shown when a prison official *knows of and disregards* an excessive risk to inmate health or safety' <u>Hamilton v. Leavy</u>, 117 F.3d 742, 747 (3d Cir. 1997) (quotation marks omitted)(emphasis added). Accordingly, "to survive summary judgment on an Eighth Amendment claim asserted under 42 U.S.C. § 1983, a plaintiff is required to produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that

risk; and (3) causation." <u>Davis v. Williams</u>, 354 F. App'x 603, 605-606 (3d Cir. 2009).

As explained in <u>Beers-Capitol</u>, in Eighth Amendment cases based on allegations of deliberate indifference on the part of prison officials or other supervisory defendants, the Supreme Court has "rejected an objective test for deliberate indifference; instead it looked to what the prison official actually knew rather than what a reasonable official in his position would have known." <u>Id.</u> at 131. Specifically, the Supreme Court "held that 'a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety.'" <u>Id.</u> (quoting <u>Farmer</u>, 511 U.S. at 837).  This requirement of actual knowledge on the part of supervisory officials "means that 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" <u>Id.</u> (quoting <u>Farmer</u>, 511 U.S. at 837).

Applying these constitutional benchmarks, it is important to note that the Eighth Amendment's protections are only triggered by excessive and prolonged confinement in restraints.  Thus, courts have recognized that brief periods in restraints of twenty fours or less typically will not give rise to an Eighth Amendment deliberate

indifference claim.  See, e.g., Key v. McKinney, 176 F.3d 1083, 1086 (8th Cir.1999) (no Eighth Amendment violation where prisoner handcuffed and shackled for 24 hours); Hunter v. Bledsoe, No. 10-CV-927, 2010 WL 3154963 (M.D.Pa. Aug.9, 2010) (ambulatory restraints used for 24 hours); Holley v. Johnson, No. 08-CV-629, 2010 WL 2640328 (W.D.Va. June 30, 2010) (ambulatory restraints used for 48 hours); Zimmerman v. Schaeffer, 654 F.Supp.2d 226, 232 (M.D.Pa. 2009)(19 hours or more in restraint chair); Moore v. Miller, No. 7:08CV00614, 2009 WL 113258 (W.D.Va. Jan.15, 2009) (26 hours); Keyes v. O'Brien, No. Civ. A. 7:06CV00437, 2006 WL 2125912 (W.D.Va. July 27, 2006) (no Eighth Amendment violation where prisoner placed in ambulatory restraints for 30 hours); Garraway v. United States, No. 04–CV–01049, 2006 WL 3054606, at *8 (D.Colo. July 24, 2006) (50 hours in ambulatory restraints); Saleh v. Ray, No. Civ. A. 02–3214, 2003 WL 23484639, at * 6 (D.Kan.2003) (24 hours in ambulatory restraints, no Eighth Amendment violation).

Guided by these benchmarks, we conclude that the defendants are entitled to summary judgment in this case on Crawford's Eighth Amendment excessive force claims.   These claims arise in an extraordinary factual setting.   It is entirely undisputed that when prison staff entered Crawford's cell he had tied a noose around his neck, a gesture threatening suicide.  Thus, the actions of staff took place in the

context of an effort to save Crawford from his own threatened self-destruction.  In

that context, the degree of force applied by staff to save Crawford from injury at his

own hands seems both  measured and minimal.  The injuries suffered by Crawford,

an abrasion, were superficial, modest and commensurate with those suffered by the

staff who were trying to rescue him.  Furthermore, those minor injuries pale in

comparison to the harm that Crawford was threatening to inflict upon himself.

Moreover, nothing in the efforts of staff to prevent Crawford from killing himself can

in any way "support a reliable inference of wantonness in the infliction of pain."

Brooks v. Kyler, 204 F.3d 102, 106 (3d Cir. 2000) (quoting Whitley, 475 U.S. at

322.)  Quite the contrary, the wanton course of conduct for staff would have been to

refrain from intervening and to leave Crawford at the risk of self-destruction.  In

short, on these undisputed facts, we find that Crawford cannot sue the prison staff for

violating his Eighth Amendment rights by using measured force to save him from his

own threatened suicide.  Therefore this claim fails.

Nor can Crawford sustain a deliberate indifference claim based upon the fact

that he was held in restraints for less than twelve hours after this angry outburst.  At

the outset, the duration of this period of restraint–11 hours–simply does not implicate

grave Eighth Amendment concerns.  See, e.g., Key v. McKinney, 176 F.3d 1083,

1086 (8th Cir.1999) (no Eighth Amendment violation where prisoner handcuffed and

shackled for 24 hours); <u>Hunter v. Bledsoe</u>, No. 10-CV-927, 2010 WL 3154963 (M.D.Pa. Aug.9, 2010) (ambulatory restraints used for 24 hours); <u>Holley v. Johnson</u>, No. 08-CCV-629, 2010 WL 2640328 (W.D.Va. June 30, 2010) (ambulatory restraints used for 48 hours); <u>Zimmerman v. Schaeffer</u>, 654 F.Supp.2d 226, 232 (M.D.Pa. 2009)(19 hours or more in restraint chair); <u>Moore v. Miller</u>, No. 7:08CV00614, 2009 WL 113258 (W.D.Va. Jan.15, 2009) (26 hours); <u>Keyes v. O'Brien</u>, No. Civ. A. 7:06CV00437, 2006 WL 2125912 (W.D.Va. July 27, 2006) (no Eighth Amendment violation where prisoner placed in ambulatory restraints for 30 hours); <u>Garraway v. United States</u>, No. 04–CV–01049, 2006 WL 3054606, at *8 (D.Colo. July 24, 2006) (50 hours in ambulatory restraints); <u>Saleh v. Ray</u>, No. Civ. A. 02–3214, 2003 WL 23484639, at * 6 (D.Kan.2003)(24 hours in ambulatory restraints, no Eighth Amendment violation).

Moreover, the use of these restraints was both reasonable and necessary in light of Crawford's violent behavior and agitated demeanor. Indeed, it is undisputed that staff used the restraints in a measured fashion, and in a manner which was directly linked to the penological goals of ensuring institutional safety, as illustrated by the fact that the restraints were removed after Crawford gained control of his emotions, and was able to present in a rational and non-threatening manner. Furthermore, the meticulous care and attention which Crawford received from prison medical and

correctional staff while in restraints belies any claim of deliberate indifference to his physical needs.   In sum, the use of restraints here was in direct response to Crawford's violent behavior.   Those restraints were employed for a limited period of time, and were removed promptly once Crawford exhibited behavior which indicated that he no longer presented a threat to himself, fellow inmates, or staff.   On these facts, a deliberate indifference claim fails, and the defendants are entitled to summary judgment in their favor.   In addition, we note that the use of these restraints was closely monitored by medical personnel and those medical staff observed no medical reason to remove these restraints.   Since it is axiomatic that correctional staff cannot be held deliberately indifferent when they defer to medical personnel on medical matters, Durmer v. O'Carroll, 991 F.2d 64, 69 (3d. Cir. 1993), this fact also compels summary judgment in favor of these defendants on this deliberate indifference claim.

But even if Crawford had stated a colorable constitutional claim relating to his January 4, 2013, cell extraction, the defendants would still be entitled to qualified immunity from these claims for damages.   In order to establish a civil rights claim Crawford must show the deprivation of a right secured by the United States Constitution or the laws of the United States.   Satisfying these elements alone, however, does not guarantee that Crawford is entitled to recover damages from these public officials.   Government officials performing "discretionary functions," are

insulated from suit if their conduct did not violate a "clearly established statutory or constitutional right[] of which a reasonable person would have known." Wilson v. Layne, 526 U.S. 603, 609 (1999); see also Pearson v. Callahan, 555 U.S. 223 (2009). This doctrine, known as qualified immunity, provides officials performing discretionary functions not only defense to liability, but also "immunity from suit." Crouse v. S. Lebanon Twp., 668 F. Supp. 2d 664, 671 (M.D. Pa. 2009) (Conner, J.) (citations omitted). Qualified immunity

> balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. The protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact."

Pearson, 555 U.S. at 231.

Determinations regarding qualified immunity, and its application in a given case, require a court to undertake two distinct inquiries. First, the court must evaluate whether the defendant violated a constitutional right. Saucier v. Katz, 533 U.S. 194, 201-02 (2001), abrogated in part by Pearson, 555 U.S. 223; Curley v. Klem, 499 F.3d 199, 206 (3d Cir. 2007); Williams v. Bitner, 455 F.3d 186, 190 (3d Cir. 2006). If the defendant did not actually commit a constitutional violation, then the court must find in the defendant's favor. Saucier, 533 U.S. at 201. If the defendant is found to have

committed a constitutional violation, the court must undertake a second, related inquiry to assess whether the constitutional right in question was "clearly established" at the time the defendant acted. Pearson, 555 U.S. at 232; Saucier, 533 U.S. at 201-02. The Supreme Court has instructed that a right is clearly established for purposes of qualified immunity if a reasonable state actor under the circumstances would understand that his conduct violates that right. Williams, 455 F.3d at 191 (citing Saucier, 533 U.S. at 202).

In order to find that a right is clearly established, "the right allegedly violated must be defined at the appropriate level of specificity." Wilson, 526 U.S. at 615. The Supreme Court has explained that, at least in some cases, "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful." Hope v. Pelzer, 536 U.S. 730, 741 (2002) (quoting United States v. Lanier, 520 U.S. 259, 271 (1997) (internal quotation marks and citation omitted)). In some cases, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." Wilson, 455 F.3d at 191 (quoting Hope, 536 U.S. at 741).

The court is no longer required to conduct these two inquiries sequentially, Pearson, 555 U.S. at 239-40, and it may forego difficult constitutional issues and

award qualified immunity to a defendant if it is apparent that the defendant did not violate rights that were clearly established at the time the defendant acted.  Id.  Where a court elects to address the alleged constitutional violations, however, the court's analysis of the merits for purposes of summary judgment merges with analysis of the deprivation of federal rights for purposes of qualified immunity.  Gruenke v. Seip, 225 F.3d 290, 299-300 (3d Cir. 2000); Crouse, 668 F. Supp. 2d at 671; see also Grant v. City of Pittsburgh, 98 F.3d 116, 122 (3d Cir. 1996) ("[C]rucial to the resolution of [the] assertion of qualified immunity is a careful examination of the record . . . to establish . . . a detailed factual description of the actions of each individual defendant (viewed in a light most favorable to the plaintiff).")  Because qualified immunity entails a consideration of whether the law was clearly established at the time of a defendant's conduct, this defense, which focuses on the state of the law, presents a question of law for the court, and one which can often be resolved on summary judgment.  See Montanez v. Thompson, 603 F.3d 243 (3d Cir. 2010).

In the specific factual context of excessive force claims based upon allegations relating to a prisoner's handcuffing, courts have acknowledged that, in certain instances, summary judgment is entirely appropriate.  Gilles v. Davis, 427 F.3d. 197, 207 (3d Cir. 2005).  With respect to these particular excessive force claims, courts agree that:  "In these cases, summary judgment for an officer who claims qualified

immunity is appropriate where, 'after resolving all factual disputes in favor of the plaintiff,[ ] the officer's use of force was objectively reasonable under the circumstances.' " Gilles v. Davis, 427 F.3d 197, 207 (3d Cir. 2005).

Applying these benchmarks, we find that the defendants are entitled to qualified immunity in this case. Nothing in the measured and restrained conduct of staff as they intervened to prevent Crawford from harming himself could have alerted these officials that their actions violated "clearly established statutory or constitutional right[] of which a reasonable person would have known." Wilson v. Layne, 526 U.S. 603, 609 (1999). Moreover, the duration of Crawford's detention in restraints fell well within the 24 hour time frame which had previously and repeatedly been recognized as a discrete period of time which did not give rise to constitutional concerns. See, e.g., Key v. McKinney, 176 F.3d 1083, 1086 (8th Cir.1999) (no Eighth Amendment violation where prisoner handcuffed and shackled for 24 hours); Hunter v. Bledsoe, No. 10-CV-927, 2010 WL 3154963 (M.D.Pa. Aug.9, 2010) (ambulatory restraints used for 24 hours); Holley v. Johnson, No. 08-CCV-629, 2010 WL 2640328 (W.D.Va. June 30, 2010) (ambulatory restraints used for 48 hours); Zimmerman v. Schaeffer, 654 F.Supp.2d 226, 232 (M.D.Pa. 2009)(19

hours or more in restraint chair).  Therefore, these officials should also be entitled to qualified immunity from damages in this case.[2]

### E.   Crawford is Not Entitled to a Prison Transfer

While these findings dispose of Crawford's specific complaints regarding his treatment on January 4, 2013, we note that Crawford also generally complains about conditions of confinement within the Special Management Unit, and seeks relief in the form of a court order directing his transfer to general prison population.  (Doc. 44.)  This final claim warrants only brief consideration, and fails for at least three reasons.

First, it is undisputed that Crawford has not exhausted prison grievances with respect to this prison transfer request.  The Prison Litigation Reform Act, 42 U.S.C. § 1997 ("PLRA") requires that prisoners present their claims through an administrative grievance process prior to seeking redress in federal court. Specifically, the Act provides that:

---

[2]Having reached these conclusions and recommendations we decline defendants' invitation to apply the favorable termination rule to this case based upon the outcome of disciplinary proceedings against Crawford, since in our view that favorable termination rule would not apply to excessive force claims like those made here. See Nelson v. Jashurek, 109 F.3d 142, 146 (3d Cir. 1997)(favorable termination rule held inapplicable to excessive force claim).

-34-

No action shall be brought with respect to prison conditions under [§ 1983], or any other federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).  In accordance with the PLRA, prisoners must comply with exhaustion requirements with respect to any claim that arises in the prison setting, regardless of the type of claim asserted, or the relief sought.  See Porter v. Nussle, 534 U.S. 516, 532 (2002) ("[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."); Booth v. Churner, 532 U.S. 731, 741 n.6 (2001) ("[A]n inmate must exhaust irrespective of the forms of relief sought and offered through administrative avenues.").

As the statute's language makes clear, the exhaustion of available administrative remedies prior to filing suit is mandatory.  See Nyhuis v. Reno, 204 F.3d 65, 73 (3d Cir. 2000) ("[I]t is beyond the power of this court – or any other – to excuse compliance with the exhaustion requirement, whether on the ground of futility, inadequacy or any other basis.") (quoting Beeson v. Fishkill Corr. Facility, 28 F. Supp. 2d 884, 894-95 (S.D.N.Y. 1998)).  Whether an inmate has exhausted administrative remedies is a question of law that is to be determined by the court, even if that determination requires the resolution of disputed facts.  See Small v.

Camden County, 728 F.3d 265 (3d Cir. 2013); see also Drippe v. Tobelinski, 604 F.3d 778, 781 (3d Cir. 2010).

Moreover, the exhaustion requirement of the PLRA is one of "proper exhaustion." Woodford v. Ngo, 548 U.S. 81, 84 (2006). Failure to comply with the procedural requirements of the available grievance system will result in a claim being deemed procedurally defaulted. Id. at 90; Spruill v. Gillis, 372 F.3d 218, 227-32 (3d Cir. 2004). An inmate cannot circumvent the PLRA's exhaustion requirement by failing to properly exhaust the prison's administrative review process, or by waiting until such remedies are no longer available to him. Woodford, 548 U.S. at 95. However, if an inmate shows that the actions of prison officials directly caused the inmate's procedural default of a grievance, the inmate will not be held to strict compliance with the exhaustion requirement. Brown v. Croak, 312 F.3d 109, 112-13. Likewise, "[w]here [the inmate] failed to receive even a response to the grievances addressing the . . . incidents, much less a decision as to those grievances, the [administrative remedy] process was unavailable to him." Small v. Camden County, 728 F.3d 265, 271 (3d Cir. 2013).

Proper exhaustion of a grievance means that a prisoner must refrain both from acting too soon or waiting until it is too late to act. Thus, "[a]n 'untimely or otherwise procedurally defective administrative grievance or appeal' does not satisfy

the mandatory exhaustion requirement of the PLRA.  Woodford v. Ngo, 548 U.S. 81, 83, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006); see also Spruill v. Gillis, 372 F.3d 218, 230 (3d Cir.2004).”  Barrick v. Prison Health Sys./Med., 335 F. App'x 153, 155 (3d Cir. 2009).  Similarly, the procedural default component of the PLRA’s proper exhaustion requirement does not permit “the filing of a suit before administrative exhaustion, however late, has been completed.”  Ahmed v. Dragovich, 297 F.3d 201, 209 (3d Cir. 2002) citing Perez v. Wis. Dep't of Corr., 182 F.3d 532, 534–35 (7th Cir.1999) (observing “Congress could have written a statute making exhaustion a precondition to judgment, but it did not.  The actual statute makes exhaustion a precondition to *suit*”); Neal v. Goord, 267 F.3d 116, 122 (2d Cir.2001) (holding that a prisoner may not fulfill the PLRA's exhaustion requirement by exhausting administrative remedies after filing her complaint in federal court). Accord Jackson v. District of Columbia, 254 F.3d 262, 269 (D.C.Cir.2001); Freeman v. Francis, 196 F.3d 641, 645 (6th Cir.1999); Alexander v. Hawk, 159 F.3d 1321, 1328 (11th Cir.1998); Garrett v. Hawk, 127 F.3d 1263, 1265 (10th Cir.1997).

Here, at the outset, Crawford’s failure to properly exhaust his administrative remedies with regard to this prison transfer issue now prevents us from considering this particular complaint.

In addition, to the extent that Crawford is attempting to argue that conditions of confinement at the Special Management Unit constitute *per se* violations of the Eighth Amendment, this claim has been considered, and rejected, on numerous occasions in the past. See e.g., Cardona v. Bledsoe, No. 13 2081, 2015 WL 66491, at *3 (3d Cir. Jan. 6, 2015); Robinson v. Norwood, 535 F. App'x 81, 82 (3d Cir. 2013); Johnson v. Chambers, 487 F. App'x 693, 694 (3d Cir. 2012); Mitchell v. Dodrill, 696 F. Supp. 2d 454, 457 (M.D. Pa. 2010).   Therefore, Crawford may not prevail upon this unexhausted claim in any event since he cannot show that the conditions of his confinement constitute a *per se* violation of the Eighth Amendment.

Finally, Crawford is not entitled to the relief which he seeks in this motion, a prison transfer to the setting of his choosing.  It is well established that the United States Constitution does not confer any right upon an inmate to any particular custody or security classification.  Moody v. Daggett, 429 U.S. 78, 88 (1976); Montanye v. Haymes, 427 U.S. 236, 242 (1976).  Thus, inmates do not have a liberty interest in retaining or receiving any particular security or custody status "[a]s long as the [challenged] conditions or degree of confinement is within the sentence imposed ... and is not otherwise violative of the Constitution."  Id.  Similarly, it has long been recognized that prison transfer decisions, standing alone, do not constitute cruel and unusual punishment in violation of the Eighth Amendment to the Constitution.  See,

e.g., <u>Hassain v. Johnson</u>, 790 F.2d 1420 (9th Cir. 1986); <u>Serrano v. Torres</u>, 764 F.2d 47 (1st Cir. 1985). Thus, even inmate transfers to facilities far from their homes do not rise to the level of cruel and unusual punishment. <u>See, e.g.</u>, <u>Gov't of Virgin Island v. Gereau</u>, 592 F.2d 192 (3d Cir. 1979)(transfer from Virgin Islands to mainland); <u>Rodriguez-Sandoval v. United States</u>, 409 F.2d 529 (1st Cir. 1969)(transfer from Puerto Rico to Atlanta). In sum, prisoners have no inherent constitutional right to placement in any particular prison, to any security classification, or to any particular housing assignment. <u>See</u> <u>Olim v. Wakinekona</u>, 461 U.S. 238, 245 (1983); <u>Meachum v. Fano</u>, 427 U.S. 215 225 (1976); <u>Montanye</u>, 427 U.S. at 242; <u>Bulger v. U.S. Bureau of Prisons</u>, 65 F.3d 48 (5th Cir. 1995); <u>Marchesani v. McCune</u>, 531 F.2d 459 (10th Cir.), <u>cert.denied</u>, 429 U.S. 846 (1976). Simply put, as a legal matter Crawford has no constitutional right to choose his prison, or custodial status. Therefore, his prayer for relief fails as a matter of law, and this request for a prison transfer should be denied.

## III.   <u>Recommendation</u>

Accordingly, for the foregoing reasons, IT IS RECOMMENDED that the defendants' motion to dismiss, or in the alternative, for summary judgment, (Doc. 18.) be GRANTED. IT IS FURTHER RECOMMENDED that Crawford's motion to be released from the SMU, (Doc. 44.), should be DENIED.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof.  Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections.  The briefing requirements set forth in Local Rule 72.2 shall apply.  A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.  The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record.  The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 15th day of April, 2015.


                                        *S/Martin C. Carlson*
                                        Martin C. Carlson
                                        United States Magistrate Judge